Okay we'll call case number 18-10545 State of Texas v. Reddick and we'll begin with Mr. Breves for the United States. Good morning your honors and may it please the court, Joshua Revez from the United States. The Affordable Care Act requires that health insurers pay an annual provider fee. The district court erroneously held that private for-profit insurers are exempt from that fee solely because they provide health insurance under Medicaid contracts with states. On that basis, the district court ordered the United States to pay plaintiffs hundreds of millions of dollars that the United States collected from private insurance companies. That order was mistaken at the thresholds, on the merits, and as to the remedy. Most fundamentally, nothing in any statute exempts private for-profit insurers from paying the provider fee when they contract with states, nor does any statute or constitutional provision shield the states from having to take the fee into account when they develop their Medicaid rates. Accordingly, the district court erred in reaching the majority of plaintiffs' complaints at all, much less in awarding the monetary relief that it did. And so I want to begin with the statutory questions, with the two fundamental statutory questions in this case. The first is, do the private insurers that government contracts with owe the provider fee? The second question is, if they do, what does that mean for states? And to answer the first question, all the court has to do is look at section 9010 of the Affordable Care Act, which we've reproduced in the first page of the addendum to our opening brief. And that statute says that covered entities owe the provider fee, that all health insurers are covered entities, that there's an exception for governmental entities, which does not apply to the private insurers with whom governments contract, and that there's an exception for non-privates. Okay, so Mr. Rivez, explain to me how this governmental exception would work, then, if the government's essentially being charged, if state governments are being charged this indirectly, how does this exemption benefit them? So the governmental entity exception is an exception to who is and is not a covered entity. So the governmental entities are not covered entities, and thus they are never assessed the by the IRS, even if they otherwise would be the definition of covered entities. But practically speaking, how does this benefit them? Because they're still through this actuarial mechanism having to pay these fees. So how are they being benefited by this exception? So the question of who bears the downstream economic effects of the tax is different than the question of who's assessed the tax directly. The statute is clear that governmental entities are not assessed the tax directly, and that means that there are certain health care systems in which governmental entities that would otherwise pay the tax directly don't. The question of who's assessed the tax... What is that? Can you give me an example? Is there a state out there that's running their own Medicaid system that is not paying the tax? So in the legislative history that plaintiffs pointed to and that we responded to, the Joint Committee for Taxation, at the time the Affordable Care Act was enacted, noted that there are some insurance, and that those counties don't pay the provider fee because of the governmental entity exception. Right now I'm not aware that there's any state that's going out and providing... I can't point to any state, but there certainly are governmental entities, and the statutory text doesn't say state, it says governmental entities. So all that is to say that a private insurer that acts under contract with a state correctly owes the provider fee unless they're non-profits that mostly provide Medicaid services. And of course Congress's inclusion of this non-profit Medicaid exception shows that Congress expected that for-profit Medicaid insurers would be assessed the provider fee. So then the second question is, if the IRS is correctly collecting the provider fee from for-profit Medicaid insurers, what does that mean for states? And the answer to that question is not the provider fee statute, because the only thing the provider fee statute says is who is and has not assessed the provider fee directly. Or rather, the answer to that question is more complicated, just as the question of who bears the downstream effects from a tax is always going to be more complicated than who has assessed the tax in the first instance. And the answer to that question here really lies in the Medicaid Act, which has an unchallenged requirement that the contracts and the rates that states negotiate with health insurers be actuarially sound. And actuarial soundness, I think all parties to this case agree, means accounting for both the benefit expenses and the administrative expenses. The administrative expenses include taxes and fees. And they include taxes and fees that the states do not ordinarily pay directly. So in this regard, the provider fee is no different than the federal corporate income tax, which is not assessed directly on state, but which is undisputedly assessed on the health insurer's contract. The corporate income tax consequences of a Medicaid contract have to be accounted for, just as the consequences of the provider fee have to be accounted for, and just as the consequences from state taxes and fees have to be accounted for, even though the states do not tax themselves directly. And that's why plaintiffs, and here I'm quoting from page 2104 of the record, that's why Texas is cheap actuary instead. In my professional opinion, actuarially sound rates include provision for all reasonable and appropriate costs that managed care organizations will incur. And in my opinion, the rates paid to a covered entity must include provision for the provider fee to be considered actuarially sound. At page 2640 of the record, another Texas official said, and I'm quoting again, in-house counsel and counsel of other state agencies also came to the same conclusion that actuarial standards require this expense, that is the provider fee, to be recognized in the formulation of sound rates that could be approved by CMS. And so I think there can be no question that if private insurers have incorrectly assessed the provider fee, that principles of actuarial soundness, however defined, require that the provider fee be taken into account in developing states rates with Medicaid insurers. And if you agree with all of that, your honors, most of this case goes away. Plaintiffs' challenge to the HHS rule defining actuarial soundness becomes largely immaterial, because as plaintiffs admitted in filing their second complaint, actuarial soundness, however defined, and now I'm quoting from their second complaint, can only result from a full dollar-for-dollar imposition upon plaintiffs of any provider fee liability. So you need to decide whether the HHS rule permissibly defined actuarial soundness. All that you have to say is that, assuming the federal government is correct on the statute, excuse me, your honors, that actuarial soundness, however defined, requires accounting for the provider fee. And then the only ones of state challenges you have. But you keep saying however defined, but doesn't the non-delegation doctrine matter, however defined? I mean, I don't know that we can just say, oh, well, but it wouldn't really matter who you delegated to, because it would come out the same way. I think you still have to address the non-delegation doctrine, don't you? Go ahead. Sorry, your honor, I didn't mean to interrupt. No, that's what I said. I think you still have to address the non-delegation doctrine, the so what, I don't think is really a defense to that. Well, I think that you don't hear, your honor, because no one is challenging the statute that requires that rates be actuarially sound. And plaintiffs have admitted that. The only challenge is to the HHS rule, and to the provider fee itself, if we acknowledge plaintiffs are standing the challenge. But as to the rule, plaintiffs have to show that the rule caused their injury, and the district court's order vacating that rule could redress their injury. Here, after the district court vacated the rule, after plaintiffs won below, plaintiffs returned to court and said, oh, you know, that order vacating the rule really did us no good, because now that we are free from the rule, we still have to take the provider fee into account. And I think that shows that with or without the rule, the result is the same. The provider fee must be accounted for. I acknowledge, your honor, that questions of standing are not always easy, but here where plaintiffs won, where they got what they wanted, and then when they returned to court and said our victory did us no good, I think that provides you a clear basis not to reach the challenges to the HHS rule. How about addressing the APA challenge? Your honor, so plaintiffs have lodged a number of APA challenges to the HHS rule. As to their challenge that the HHS rule impermissibly interpreted the phrase actuarial and sound, again, I just think it's notable that plaintiffs' own actuaries, free from the strictures of that rule, have concluded that actuarial soundness requires exactly what the rule required, which is taking into account the provider fee. As to plaintiffs' notice and comment challenge, the 2002 rule went through notice and comment. There's no dispute over that, and I think that's the only thing that you need to say to resolve that question. And as to their arbitration capricious challenge, again, there's no question that the rule permissibly and rationally defined actuarial soundness, because as plaintiffs admit, and now I'm quoting from page seven of their brief, actuarial soundness is generally designed to infer that managed care organizations cover their costs without making excessive returns. And that includes taking into account all taxes and fees that are validly assessed on the managed care organizations. On the arbitrary and capricious challenge, do you believe that the state's arbitrary and capricious challenge is rightful review, even though they never petitioned to amend the rule? So we think that the arbitrary and capricious challenge has to be assessed on the record that was available to the agency at the time that it promulgated the 2002 rule. We also think that this is all barred by the statute of limitations. I'm happy to talk more about that if the court has any questions. And at the time of the 2002 rule, the only comments in the record from states were comments approving of the rule, suggesting that it would give states more flexibility to develop their managed care contracts. So we think the arbitrary and capricious challenge fails on all of those basings, Judge Willett. On a question, jumping back to what is and is not a direct and final action. So the 2015 SAR letter found a record, I think 297. So it approves Texas' capitation rate that included the provider fee. And I'm still not quite convinced by your briefing that this was not a direct final agency action. I mean, they approved the Texas capitation rate, and how is that not direct and final? Well, I think it has to be a direct and final action that adversely affects the states. And a letter approving what the states want, a letter saying you submitted a contract, and we say, yes, we're giving you everything that you want, is not a direct and final agency action adversely affecting the states. You know, typically to sue, you have to point to something that injures you. You can't point to a request that you made that then gives you what you want. Well, certainly Texas will not have challenged that approval. That's correct, Your Honor. And they have to have an agency action that they can challenge within the six-year statute of limitations in order to be within the statute of limitations. I think that's what this court said in Don McCampbell. And certainly I'm aware of no case in which a plaintiff was allowed to circumvent the six-year APA statute of limitations solely by pointing to an agency action that, rather than injuring them, actually did what plaintiffs want. And even if you disagree with us on some of this, and even if you reach plaintiff's challenge to the HHS rule, the statutory conclusions we've already discussed, I think, clearly leads to the conclusion that the district court erred in awarding plaintiffs what it called equitable disgorgement. That's for two reasons. First, the measure of disgorgement is what a United States correctly assessed the tax on private managed care organizations. The United States has not been unjustly enriched and thus would not be subject to disgorgement even were it a private party. The second reason, of course, is the United States is not a private party, that it is entitled to a sovereign's immunity, that the Administrative Procedure Act waives the government's sovereign immunity only for relief other than money damages. And the Supreme Court in the Bowen versus under the APA to get specific relief, relief that's analogous to specific performance at the common law of contracts. There are two forms of specific relief that the Supreme Court has recognized. The first is if the government seizes specific property or money, as for example, under a forfeiture statute. A plaintiff can sue under the APA to recover that. The plaintiffs to this case are not invoking that exception. And the second exception is that if there's a statute that in the Supreme Court's words happens to be for the payment of money, that is, if there's a statute that says, as the statute did in Bowen, that the secretary shall pay certain funds, you can sue under the APA to enforce that statute. It's not disputed that there's no sort of shall pay statute here. That distinguishes this case from Bowen, that distinguishes this case from every equitable disgorgement case that plaintiffs cite in their reply brief, excuse me, your honors, has that sort of shall pay language in a statute or regulation. So this is not a super specific relief. Accordingly, plaintiffs cannot get money damages under the APA. And I think that's all I have to say about the materials in the government's appeal. Let me just turn briefly to plaintiff's challenges to the provider fee as applied to them. Those challenges we agree to plaintiffs have standing to raise. We just think they fail on the merits. A plaintiff's spending clause challenge fails because the spending clause places limits on government conditions on the receipt of federal funds. There is no condition on the receipt of federal funds in the provider fee statute, and thus the provider fee cannot be unconstitutional on that basis. And finally, plaintiffs claim that the provider fee violates principles of intergovernmental tax immunity fails because the Supreme Court has repeatedly made clear, most recently in the Baker case, that governments can tax other governments' contractors, even though those taxes will ultimately be borne by the government as an economic matter. That precedent resolves that issue. I see I have 30 seconds left. I'm happy to answer any other questions if the court has them. Thank you. You reserve time for rebuttal. Thank you, Your Honor. And I'll ask Ms. Pettit to respond. Okay, you need to unmute, Ms. Pettit. Thank you, Judge Haynes, and may it please the court. Lenora Pettit for Cross Appellate States. Despite the litany of legal issues raised in the briefing, this case turns on only two questions. Did the Affordable Care Act require the state to manage their Medicaid system through an NCO model to pay the HIT fee? And was it legal for Congress as an executive to do so? I will explain why the answer to each of those questions is no. And unless the court has specific questions, I will focus on the spending clause and the non-delegation doctrine. To the extent that I have time, I'll turn to the equitable disbordment issue. First, states are exempt from paying the HIT fee even if they manage their Medicaid programs through the predominant NCO model. Now, my opposing counsel just spent a lot of time talking about a tax on a private entity. We are not asking this court to extend to the state what he did not dispute the state have, which is an exemption from the HIT fee, to cover entities with whom we do business. Instead, we simply ask the court to do what the Supreme Court has repeatedly required it to do, which is to start your analysis in any tax case by identifying the relevant taxpayer. And that, in numerous cases including Alabama against King and Boozer, requires this court to consider two factors. What my opponent called the downstream economic impact and assuming the tax is paid and who bears the legal burden if it is not. And we do that by examining the contract between the parties and the larger legal framework. In this case... I'm just trying to understand. You agree that the notion of actuarial soundness makes sense in this context, right? Generally speaking, yes, Your Honor. Okay. So, I don't understand really if you have insurance company A, and we'll just make it really simple, they pay doctors $200, they pay taxes of $100, and they'd like to make a profit of $10, then under your assistance, they can only charge $210. But then that would mean they lose $90 instead of make $10. Can you just explain that math to me just plain and simple on this point? I want to make... I'm not sure I got all of the numbers precisely correctly. It doesn't matter. The point is, they're paying the tax. They want to make a profit, and how can they make a profit, a reasonable profit, I understand. How can they make a profit if they're not able to include the tax and the amount of money that they're seeking from the state? So, the state doesn't dispute that they can include some of the tax. However, our injury comes from the fact that the actuarial soundness, as it's currently formulated under ASOP 49, requires the state to bear all of the tax. And as a result, we are injured in our ability to negotiate precisely what that reasonable profit that Your Honor mentioned would be, because as ASOP 49 currently stands, because the HIPC is a non-deductible excise tax, there must be a direct dollar-for-dollar adjustment after the negotiation process. And so that is the sort of... But the company is paying that dollar. It's not like they're not, and they're trying to get it from you all. So, I'm just still trying to understand. I mean, you use whatever math you want to use to explain to me how you can avoid accounting for this tax that they are paying. So, maybe I'm not connecting with Your Honor on the definition of accounting for. We think that the tax can be considered in negotiations for determining capitation rates. Whether or not it should have been... The tax should have been extended to Medicaid and CO contracts to begin with is the subject of the second lawsuit that my closing counsel referenced. However, it is being paid by the insurance company. What we are asserting is a right to not have to pay an automatic adjustment so that we cover 100% tax, but instead to be able to negotiate for how much of the tax we cover versus how much... So, you're saying they should allocate this tax somewhere else to a regular paying insurer, and that's where you think the issue lies? Yes, and that's primarily the subject of the partial recompense for our injury and the procedural injury that I just mentioned is the injury that we are seeking to remedy here. So, we are simply asking the court to hold, as the Supreme Court required, that the economic impact, as well as the legal burden, must be considered in who the relevant taxpayer is. And here, due to the structure of the HIT rule, that relevant taxpayer is the state. So, we were exempt from paying it under 9010C2, and nevertheless, it is now undisputed that states have paid nearly half a billion dollars under this tax. Okay, but what if they were only doing Medicaid work, the particular insurer? Would that change your analysis? I'm not entirely certain I saw your Honor's question. Are you trying to understand? To me, it makes no sense that you actually sound would leave out dollars that the insurer is paying. It sounds like you're saying, well, they should shove it off on someone else, one of their other insurers. I'm asking, what if they didn't have any other insurers? They don't have to be... They still want to make a profit. They want to make a profit off of Medicaid. Maybe that's not a very good business model, but I'm just saying. What about that? So, maybe the best way to think about it is to take a step back to look at what the HIT fee was designed to do, which was it was designed to put a tax on the windfall that insurance companies were expected to receive from having increased enrollment under the Affordable Care Act, so that the tax was designed to tax insurers, and so that they are not getting this additional profit. And so, we agree they need to make a profit, but they have a lot more people, and so as a result, they can get a smaller profit per person. And that's what we're suggesting in response to your honor's question. Can they still get a profit, but a pretty small profit per person? You're math analysis is just different than my math typo. I believe so, your honor. Okay. That's... They're going to have... I'm sorry, Judge Willard, I didn't hear you. I'm sorry. No, go ahead and finish your response to Judge Chaney. That's fine. So, I was just going to say, we agree they should make a profit, but they're having a lot more people. So, to make the same profit, they can make a smaller amount of profit per person. That's all my math is. I wanted to make sure I'm understanding with precision what the state's exact claims are. So, you're urging that section 9010 violate the spending clause, correct? Yes, your honor. Can you identify for me the exact conditions on spending that section 9010 imposes? Because as I read the statutes, it's only 1396B that imposes the condition on spending, the axillary sound provision. What specific conditions does 9010 impose? So, under the government's view of 9010, 9010 imposes the condition on states that they pay the HIPP fee for private insurers in order to receive Medicaid funding. That's the federal government's position is the condition on spending. We think we were exempt from that, but if you were to disagree with me on that, that is the condition on spending. Okay. And just to be clear, you're not challenging 1396B on spending? No, your honor. Not under the spending clause. We're not challenging 136B at all. So, it is unusual to be talking about the tax under the spending clause. But as the a unique circumstance and a unique interaction between federal statutes and regulations that result in what Congress normally couldn't do, namely a tax on states. And so, that puts us back into the familiar five-part framework under Dole. And nobody is disputing whether the first element is met, namely that the Medicaid serves the public interest. It does, however, fail the other four elements. Specifically, the Supreme Court has said repeatedly in Pennhurst and in Arlington Central and numerous other cases that spending clause legislation is to act like a contract. And to be permissible a condition, there must be knowing and voluntary consent to any condition. Now, knowing consent requires, as this court said in pace and recently reaffirmed in Gruber, a stringent clear statement. And the fact that we just had this conversation for 10 minutes makes it clear that, if anything, 90-10 is unclear. And so, it fails the notice requirement. It also fails the voluntariness requirement for the reasons that the Supreme Court explained in NFIB in 2012, namely that Medicaid is such a huge percentage of the state's budget that they cannot reasonably reject any particular condition from the federal government because it's unaffordable. Now, in NFIB, the court said it was 10 to 16 percent of the budget. Here, it's the exact same risk. If anything, it's gotten bigger. And the record reflects that in Indiana, it's 22.6. This NFIB case also resolves our arguments under the relatedness requirement. Now, we don't dispute that Congress can require the state to spend the money in a particular way, but the condition needs to be reasonably related to the purpose of the spending. And in this case, the United States doesn't even attempt to meet that standard. Instead, they say the standard doesn't apply because this is a tax law. As we've just discussed with Judge Willett, that is not the case because of the unique sort of structure of this law. So, under NFIB, you can't condition the receipt of here, that's inconsistent. So, finally, it's subject to a, the fourth element is not subject to another constitutional limitation, and that is the intergovernmental tax immunity point. And my opposing counsel pointed to the Baker case. So, Baker is an intergovernmental tax immunity case, but it's not the only one. And the Supreme Court has repeatedly said in a number of cases, including Massachusetts and Sousa, in the New York case, in Jefferson County, that there are two tests for when there is a direct tax on states. And for the reasons we've already discussed, this is a tax on states. And it's unconstitutional, it's either discriminatory or an impendence on a sovereign function. The easier test here is impending on a sovereign function. And that is clearly the case because, once again, as NFIB recognized, states have spent creating detailed administrative processes to administer Medicaid through their health policies, through the Medicaid system, and that is impinged upon by this statute. So, any one of those four elements is fatal under the funding clause test, and all four exist. So, Congress could not have imposed paying a hit fee as a condition on receipt of Medicaid funding, nor could they have delegated to the executive to do so. And so, turning to the questions that Haines asked about the non-delegation doctrine, actuarial soundness, as it existed in 1981, was a completely undefined term. Now, non-delegation doctrines in general have a number of flavors. We're focused on the one that says that, under the structural articles of our Constitution, each branch of the federal government is awarded certain powers, and they can't delegate them to each other or to private parties. Now, the Supreme Court has identified three general exceptions to this rule, where the Congress can empower the executive to do things that have some indicia of legislative impact. One, they can fill in gaps, they can find facts, or they can, I beg your pardon, or they can take non-executive action or non-legislative action. So, the United States has justified this particular delegation under the cases in Curran and Rockwell, and I want to sort of focus on that for just a second. Those two cases each involve a delegation that fit within that second category, namely that the executive may find facts. In that particular instance, the Congress had required the executive to find a certain amount of acquiescence among the regulated community, and they formalized that acquiescence and the process of doing that by allowing a type of referendum. So, those are both solidly Category 2. Here, there are a number of delegations, but they are mostly focused on Category 1, meaning filling in gaps in congressional legislation. So, specifically, I'm referring to the ASB's ability to promulgate forward-looking rules. That's solidly one that's filling gaps, and under the cases like Whitman and NCI Telecom, whether Congress has the ability to or should be deemed to have delegated the power to fill in gaps is determined by the significance of the decision, and in this case, you have a tax on states thereby that implicates federalism concerns that was passed on Medicaid, which affects up to states up to 25% of their budget, and one of the most significant pieces of legislation this country has ever seen. That is an important decision. Articulate, please, how you see Section 9010 changing what was in effect for Medicaid, which began, I think, in 1965. So, Section 9010 creates a unique federal premium tax that has never existed up until 2010. It is a tax designed specifically to fund certain federal programs that weren't in existence before 2010, and it has the effect of increasing the tax on states, all of which is different. Does that answer your question, Ms. Barksdale? So, that's a significant question that Congress should have answered, and it didn't, and so, as a result, that violates the non-delegation doctrine, and it also, even if you look more broadly to the term intelligible principles, which was the focus of the disagreement between the majority and the dissent in Dundee, actuarial soundness itself is not an intelligible principle. That's not a term that's used in actuarial science. In fact, that's noted at page 3197 of the record, when an actuary sent a comment to the ASB when creating ASOP 41, actually, I think ASOP 1, that actuarial soundness is just not a term actuaries use. Instead, it's a term that's imposed by regulation, and here, you have a regulation that follows the board, and the board saying that the actuarial soundness is defined by regulation. That's not an intelligible principle. That's a state statute. When did actuarial soundness was a term that began being used? Well before 1910, wasn't it? The term was used, but it was never defined, and so, there might have been other problems. When was the term first used? 2002? The term actuarial soundness first used in Medicaid, I believe, in 1981, but the term was just never given any meaning, and as a result, in fact, the executive was asked to give it meaning, and it was unable to do so, leading to actual complaints from the United States Congress about my quote, failure to regulate. You see that on ROA 1064. It's just not a defined or definable term, and so, Congress cannot condition state's receipt of Medicaid funding on such a vacuous, unanswered concept, and so, that comes to the question of if Congress couldn't do it under the spending clause, and they couldn't allow the executive to do it under non-delegation, what's the appropriate remedy, and we respectfully submit that the court appropriately required equitable disgorgement, so you heard my opposing counsel talk about Bowen. Bowen is an extremely important case because it recognizes that the term monetary damages is not, or money damages in the APA is not co-extensive with the term monetary relief of the United States insurance freeze. Instead, it allows states to sue for specific relief that can take the form of monetary relief if they are attempting to enforce a statutory mandate. It's, in fact, the same statutory mandate in this case that was in existence in Bowen. Specifically, the state is entitled to receive a particular percentage of their Medicaid funds not subject to the HIPC, and so, that's the same thing. That's what we're asking for. That's what the district court ordered, and so, as a result, that's what we're asking for, and also, a number of cases that the United States cited in their briefs are an opposite. These include cases, for example, where the particular agency was dividing up funds in a particular year, and the case really was about the appropriations clause and not about sovereign Now I can. Just one more clarification question. Can you clarify for me the exact argument you're making with your notice and comment claim? Are you arguing that ASOP 49 created a new substantive rule without the requisite notice and comment or something else? Yes, Your Honor, we are. The original version of the, I think it's 438.6 at that point, 42 CFR, the certification rule, allowed the ASA to create binding law under federal law, and they did so in ASOP 49. The first binding rule created for, specific to Medicaid, and that we maintain is a substantive rule. It's binding on states, and as a result, it needed to go through notice and comment. The fact that it was created by a private entity is a non-delegation problem, but as this court recognized recently in the EOSC case, that does not mean it wasn't a binding rule. So unless the court has any further questions, we ask that it hold that it was unlawful for the federal government to impose the HIPAA on states, and that it was appropriate for the district court to order the funds that the state paid under the HIPAA to be returned. Thank you. All right. Thank you. We'll now hear the rebuttal. Thank you, Your Honor. Just a few quick points. First, Judge Barksdale, you asked about the nature of actuarial soundness. Opposing counsel suggested that actuarial soundness is a recent and difficult to define term. I would just point the court to a 1967 Senate report that's reprinted on page 16 of the MHPA amicus brief. That says that actuarial soundness depends upon, and now I'm quoting, the rates being adequate to meet the benefit payments and the administrative expenses. We cite actuarial standard of practice from the same thing. The states have said the same thing, both in the record and in their own brief at page seven. This just isn't a difficult concept. Actuarial soundness means accounting for all relevant costs. And so you heard my, it wasn't a very good math, so I realize it was overly simplified, but you heard her response, Ms. Pettis' response. What is your reply to her response to my math problem? Just going back to that question, Your Honor, the provider fee is assessed per premium, right? So it's actually very easy for health insurers to figure out what percentage of the provider fee is done through the Medicaid program and what percentage is owed based on whatever other non-Medicaid business they're doing. So just to keep your hypothetical, imagine that you had an insurer that only provided Medicaid health services. That insurer would know exactly how much of the provider fee came from its Medicaid services. And it would be able to tell the state, well, I incurred a million dollars in the provider fee and your rate has taken into account to be actuarially sound. The same is true if the insurer also had some side business, because it's very easy to tell how much of that money comes from the Medicaid business and how much of it comes from the non-Medicaid business. Her argument, which I perceive as saying, we want some of that provider fee that would be assessed for Medicaid to be put on the non-Medicaid insurers. What is your response to that? Well, I think that argument is inconsistent with Plaintiff's Council's allegations in the second complaint. The plaintiff's actuaries, and again, I'm quoting, have concluded actuarial soundness can result only from a full dollar for dollar imposition upon plaintiffs of any provider fee liability. And of course you can't, you know, it wouldn't be actuarially sound for a state to force a private insurer to say, well, you know, run the part of the business you're doing with us at a loss and run the part of the business you're doing with someone else at more of a profit. That gets the incentives wrong. And I would just point the court to the eighth amicus brief, where these are health insurers that concede that they are subject to the provider fee, even when they provide Medicaid services. And they say the district court's decision places Medicaid MCOs in the untenable position of being required to deliver contractually mandated services in exchange for capitation rates that, contrary to statutory requirements, cannot be actuarially sound. If a health district court is willing to potentially jeopardize the financial viability of Medicaid management organizations and destabilize the markets from state Medicaid programs they serve. And there's just no reason to do that, especially if the statute is so clear that those organizations owe the provider fee and that actuarial soundness requires taking that into account. And finally, Judge Willett, I just want to address your exchange with the opposing council as to the spending clause and intergovernmental tax immunity. As to the spending clause, as far as I can tell, the implication of Plankett's position is that every time the federal government raises or imposes a fee or tax, that would implicate the spending clause to the extent that states bear a downstream burden from that tax. That would mean that if tomorrow Congress raised the corporate income tax 1 percent, that could well violate the spending clause because it would make states Medicaid rates have to be higher. And Plankett's view, it would violate the spending clause to ever raise the corporate income tax because the money from the corporate income tax would not necessarily go to Medicaid services. That just can't be the law. And finally, on intergovernmental tax immunity, Plankett's view relies entirely on their theory that they are being taxed. Again, they are not being taxed. The private organizations they do business with are being taxed, and Plankett's fearsome economic burden of the tax. Just to give an analogy, you know, I am not a covered entity because I'm a government lawyer and I don't provide any health insurance. But I go out and I purchase health insurance from a for-profit, and the rates that I pay for that health insurance take into account the provider fee. That does not mean that I am being taxed the provider fee, and it wouldn't be any different if there were a statute that said the rates that all private insurers have to charge must be actuarially sound. For that reason, the states aren't being taxed, and that's cited to most of their challenges. Accordingly, if there are no further questions, we just ask that this report's judgment be affirmed in part and reversed in part, and that summary judgment be granted to the United States. Thank you very much. Okay, thank you so much to counsel. We really appreciate it, and this case is now under submission. I would ask the courtroom deputy to excuse the attorneys and of course turn off the public stream at this point.